# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

**DILLON MVURI,**

**v.**

**Case No. 1:18-cv-875**

**AMERICAN AIRLINES, INC., et al.**

## <u>MEMORANDUM OPINION</u>

*Pro se* plaintiff Dillon Mvuri, a member of the International Association of Machinists and Aerospace Workers (the "Union") and a former employee of American Airlines ("American"), is suing the Union for breach of the duty of fair representation and American for breach of the collective bargaining agreement after he was terminated from his position as a baggage handler on January 30, 2017. American and the Union have filed motions for summary judgment, arguing that plaintiff's claims are time-barred and, in any event, also fail on the merits. Plaintiff filed oppositions to defendants' motions for summary judgment as well as his own cross-motions for summary judgment against each defendant. All of these motions have been fully briefed and argued.

For the reasons that follow, American and the Union are correct that plaintiff's claims are time-barred. In any event, even assuming plaintiff's claims are not time-barred, his claims nevertheless fail on the merits. Accordingly, summary judgment must issue in favor of the Union and American and against plaintiff.

# I.

## A.

As an initial matter, it is necessary to be clear as to the content of the summary judgment factual record. In this regard, it is necessary to address whether the parties have complied with the requirements for presenting a summary judgment motion as set forth in Local Rule 56 and the Rule 16(b) Scheduling Order inasmuch as a party's compliance or noncompliance with the Local Rule and the Order defines the content of the summary judgment record. Pursuant to Local Rule 56(B) and the Rule 16(b) Scheduling Order, a motion for summary judgment must contain a separately captioned section listing, in numbered paragraph form, all material facts that the movant contends are not genuinely disputed. *See* Rule 56, Local Civ. R.; Rule 16(b) Scheduling Order (Dkt. 32). The nonmovant must then respond to each numbered paragraph indicating whether or not the nonmovant disputes the asserted fact and, if the nonmovant disputes an asserted fact, the nonmovant must cite to the legally admissible evidence in the record supporting the dispute. Failure to respond in this fashion means that the asserted fact will be taken as admitted. Similarly, it is not sufficient when disputing a fact for a nonmovant to provide a narrative without citation to the record. Such a response will result in the fact being deemed admitted. *See Integrated Direct Marketing, LLC v. May*, 129 F. Supp. 3d 336, 345 (E.D. Va. 2015).

Although the Union and American substantially complied with both the Local Rule and the Rule 16(b) Scheduling Order,[1] plaintiff did not do so. Plaintiff's cross-motions for summary

---

[1] The defendants failed to provide support for only three alleged undisputed facts, one asserted by American and two asserted by the Union. American, in its undisputed fact 41, cites to a portion of plaintiff's deposition transcript that was not included in the transcript excerpts submitted in either American exhibit 1 or 3. For its part, the Union does not cite to any portion of the record in its undisputed facts 14 and 33. Accordingly, these three asserted undisputed facts will not be taken as admitted.

judgment and opposition to defendants' motions failed to comply with the Local Rule.[2] Specifically, plaintiff does not cite to any portion of the record when setting forth his own statements of undisputed facts in support of his cross motions for summary judgment against both American and the Union. *See* Pl. American Opp'n at 8-9; Pl. Union Opp'n at 5-6. Additionally, although plaintiff admits that he "agrees with" 12 of American's 47 undisputed facts and 10 of the Union's 43 undisputed facts, he did not clearly and specifically respond to the remaining 35 facts asserted by American or the remaining 33 facts asserted by the Union. Instead, plaintiff stated his "disagreement" with those remaining 68 facts and often submitted his own narrative response explaining his disagreement without citation to any portion of the record. *See Integrated Direct Marketing*, 129 F. Supp. 3d at 345 (a party's "narrative version of its own interpretation of the facts fails to comply with Local Civil Rule 56(B)"). Moreover, by failing to provide citations to the record, plaintiff fails effectively to dispute the facts as set forth by American and the Union. Accordingly, in these circumstances, "a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated." *Caban Hernandez v. Phillip Morris USA, Inc.*, 486 F.3d 1, 7 (1st Cir. 2007); *Foglia v. Clapper*, 885 F. Supp. 2d 821, 823 (E.D. Va. 2012) (same).

Additionally, plaintiff has submitted his own affidavit in support of his cross-motions for summary judgment and in opposition to defendants' motions for summary judgment. Nowhere in his briefs, however, does plaintiff cite to, or purport to rely, on his affidavit. Moreover, the affidavit, at times, contradicts plaintiff's sworn deposition testimony. To address those contradictions, plaintiff simply denies that his deposition testimony is accurate. *See* Pl. Union

---

[2] Plaintiff's cross-motions for summary judgment were untimely as they were filed well after the deadlines set for such motions in a March 8, 2019 Order. Because plaintiff is *pro se* and because the defendants had an adequate opportunity to respond to plaintiff's motions, plaintiff's motions, as a matter of grace, are considered as timely filed.

Opp'n at 11 ("The transcript of Plaintiff's deposition is completely wrong and inaccurate in that regard."). Courts have uniformly and sensibly held that a party cannot create a disputed issue of fact by submitting an affidavit that contradicts a party's prior deposition testimony. *See, e.g., In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011) (a party "cannot create a dispute about a fact that is contained in deposition testimony by referring to a subsequent affidavit of the deponent"). Courts have also rejected attempts by parties to recant their deposition testimony. *See Margo v. Weiss*, 213 F.3d 55, 61 (2d Cir. 2000). Rule 30(e) of the Federal Rules of Civil Procedure provides that a deponent has the opportunity to review a deposition transcript for error. If plaintiff failed to do so carefully or waived the right to review the transcript, plaintiff cannot now "conjure up a triable issue of fact" by disputing the accuracy of his transcribed testimony. *Margo*, 213 F.3d at 61. Essentially, plaintiff attempts to "conjure up" a disputed fact here by disputing his prior testimony. *Id.* He cannot do so, and therefore the asserted fact is properly taken as admitted.

## B.

As a result, the statement of undisputed material facts listed below is substantially based on the defendants' statements of undisputed facts. As for plaintiff's alternative narrative of facts, that narrative has been scoured for facts that might be viewed as in conflict with the facts stated here; where such disputes exist, the plaintiff's facts are, as noted below, either immaterial or not supported by admissible record evidence.

1. Plaintiff holds a bachelor's degree in Politics and Administration from the University of Zimbabwe and has an MBA from the University of Maryland University College.

2. Plaintiff has extensive experience in human resources and labor relations, including participating in the adjudication of hundreds of cases involving collective bargaining agreements as a Principal Labor Officer in the Zimbabwe Ministry of Labor.

3. American (and its predecessor US Airways) employed plaintiff as a Fleet Service Agent ("FSA") from 2012 to 2017 at Ronald Reagan Washington National Airport ("National Airport"), which included baggage handling.

4. The Union is a labor organization which represents employees in the aerospace, transportation, automotive, and defense industries. The Union is the certified collective bargaining representative of American's Fleet Service Employees.

5. During plaintiff's employment with American, he was represented by the Union for collective bargaining purposes and the terms and conditions of his employment were governed by both a collective bargaining agreement (the "CBA") and American's Rules of Conduct.

6. Although American, on some occasions follows a progressive discipline policy, neither the CBA nor the Rules of Conduct require that American follow a progressive discipline system.[3]

7. The CBA sets forth the following multi-step grievance process for employees to contest a discharge:

   a. "the affected employee through the Local Committee, shall file his initial grievance with the Customer Service Director within seven (7) days of the discharge";

   b. the "Customer Service Director shall schedule a hearing on the discharge grievance within ten (10) days of the filing of the grievance" and the hearing officer will determine whether the employee was discharged for just cause;

   c. the "written decision of the Customer Service Director shall be issued within ten (10) days of the hearing";

   d. that "decision may be appealed with or through the Assistant General Chairman or his designee within fourteen (14) days"; and

   e. the Assistant General Chairman's decision may then be appealed to the Systems Board of Arbitration within thirty days.

   *See* DeForest Gaskins Decl., Exh. A, CBA, Art. 20(B), (E) and (F).

8. The time limits for filing grievances are strictly construed. *See* CBA, Art. 20(G). Specifically, Article 20(G) provides:

---

[3] Although plaintiff disputes this fact, as discussed further *infra*, plaintiff fails to provide a citation to any provision of the CBA that *requires* progressive discipline. Defendants, on the other hand, have provided the CBA itself and two declarations – one from a manager at American and a second from a Union steward – averring that the CBA has no provision requiring progressive discipline. Accordingly, the undisputed material facts on this summary judgment record establish that the CBA does not require progressive discipline.

a. "The time limits set forth in this Article may only be waived by mutual, written agreement of the parties."

    b. "Failure of the employee or his Union representatives to comply with any of the prescribed time limits will withdraw any such grievances from further consideration."

9. American's Rules of Conduct provide that employees must "report for work on time" and "remain in the area necessary for the efficient performance of your work." Decl. of Raziya Brumfield, Exh. D, Rules of Conduct at 1.

10. American's Rules of Conduct further provide that "[s]ome violations of our Guiding Principles and Rules of Conduct will result in immediate termination." Rules of Conduct at 2.

11. Joseph Turay is employed by American. During plaintiff's employment with American, Turay was a Shop Steward for the Union.

12. Plaintiff has known Turay since he started working for American in 2012. Plaintiff described his relationship with Turay as "normal," agreed that it was "friendly," and denied perceiving any hostility from Turay. American Exh. 1, Mvuri Depo. I Tr. at 37. Plaintiff would also consult with Turay when he needed assistance in dealing with American.

13. Depending on the shift he worked, plaintiff's responsibilities as an FSA included: (i) working on teams with two or three other FSAs loading and unloading passenger baggage; (ii) cleaning the ramp; or (iii) working in the baggage room.

14. In order for American to accomplish the loading and unloading of customers' checked baggage in a timely manner, FSAs must be in their assigned flight areas at the appropriate time and perform their duties efficiently and effectively.

15. There are multiple ways that FSAs can access their specific assignments after checking in for work. Assignments are posted on an employee portal ("Workbrain")[4] and employees can access Workbrain through a personal phone or by using one of American's computers at National Airport. Printed assignments are also posted on the wall in the employee breakrooms and in the bag room at National Airport. Plaintiff typically carried his cell phone with him while working.

16. During his employment, plaintiff received several warnings and disciplinary notices.

---

[4] A website portal is a specially designed website that serves as a single point of access for information. *See* Web Portal, *available at* https://www.techopedia.com/definition/17352/web-portal (last visited August 26, 2019).

17. On October 15, 2013, an American supervisor engaged in a coaching or counseling session[5] with plaintiff and issued plaintiff a written warning after he failed to complete a mandatory online training. A union representative was present to advise or assist plaintiff during this session.

18. On March 18, 2015, an American supervisor engaged in a further coaching or counseling session with plaintiff and issued plaintiff a written warning for failure to arrive to work an assigned flight the previous day. In this regard, Shift Manager Mike Smith cautioned plaintiff:

> "When you are at work and on the clock, you must make yourself available to work your assigned flights. . . . Any further violation of these policies will result in further progressive discipline up to and including termination of your employment."

A union representative was present to advise or assist plaintiff during this session.

19. On April 18, 2015, an American supervisor engaged in yet another coaching or counseling session with plaintiff and issued plaintiff a written warning for failing to meet a flight and leaving his work area without notifying the appropriate staff. Plaintiff described the incident as insignificant. A union representative was present to advise or assist plaintiff during this session.

20. On December 7, 2015, an American supervisor issued a Level 1 written warning to plaintiff for arriving late to his work assignment. A union representative was present to advise or assist plaintiff at this meeting.

21. On May 17, 2016, an American supervisor issued a Level 2 written warning to plaintiff and suspended plaintiff for three days for not being in his assigned area. Shift Manager Ray Boseman directed plaintiff to "make immediate and sustained improvement." A union representative was present to advise or assist plaintiff during this meeting.

22. On October 28, 2016, American Manager Sterling Swanson questioned plaintiff concerning whether he failed to arrive to meet a flight. Although American's records confirm that Swanson issued plaintiff a Level 3 written warning, plaintiff denies receiving the Level 3 written warning.[6]

---

[5] Neither the parties nor the CBA define what the parties mean by "coaching discussion." A coaching or counseling session, however, appears to be a disciplinary step before the Level 1, 2, and 3 written warnings that American issues as part of its progressive discipline policy.

[6] As discussed further *infra*, the CBA did not require progressive discipline. Thus, whether plaintiff received the Level 3 discipline is immaterial to plaintiff's claims regarding his discharge. Whether American's purported failure to give plaintiff notice of the Level 3 discipline constitutes a separate violation of the CBA is discussed *infra*.

23. On January 6, 2017, plaintiff volunteered to work an overtime shift the next day from 5:00 a.m. to 10:30 a.m. When plaintiff reported to work on January 7, 2017, he failed to see his name on the schedule. Plaintiff did not check Workbrain or contact a manager to determine where he was assigned to work.

24. Plaintiff proceeded to the bag room and checked the schedule posted there. Plaintiff's name was not on the bag room schedule. Plaintiff remained in and worked the bag room from 5:00 a.m. to 9:00 a.m. Plaintiff never left the bag room to check to see if his name on was on a schedule posted elsewhere.

25. At 9:00 a.m. plaintiff learned that he was scheduled to work on the ramp, and not the bag room.

26. At the end of his shift, plaintiff met with American management. American's managers then withheld plaintiff from service pending investigation. During this meeting, plaintiff was represented by Turay who was available to advise or assist plaintiff.

27. On January 22, 2017, plaintiff attended a meeting with American Manager Deforest Gaskins with Turay acting as plaintiff's union representative.

28. At that meeting, Gaskins presented plaintiff with a Last Chance Agreement. The Last Chance Agreement stated that plaintiff "failed to adhere to Company policies and standards with respect to performance." Brumfield Decl. Exh. M, Last Chance Agreement at 1. The Last Chance Agreement further stated that "the Company has just cause to terminate Employee." *Id.* The Last Chance Agreement provided plaintiff "a final opportunity to comply with Company policies and procedures," in lieu of termination. *Id.*

29. In order to receive the benefits of the Last Chance Agreement, plaintiff had to agree:

    a. That neither plaintiff nor the Union would file a grievance challenging the terms of the agreement.

    b. That plaintiff waived, released, and discharged all of his rights against American that arise out of his employment, including any claims under the Age Discrimination in Employment Act.

30. Under the terms of the Last Chance Agreement, after signing the agreement, plaintiff could unilaterally revoke the agreement for seven days.

31. Turay and plaintiff discussed the Last Chance Agreement. Turay recommended that plaintiff sign the agreement. Turay concluded that American had just cause to terminate plaintiff's employment. Plaintiff testified that he had no reason to believe Turay was not sincere in recommending that plaintiff sign the agreement. Plaintiff understood Turay's recommendation to be: "If you want to preserve your employment, you have to sign it." Mvuri Depo. I Tr. at 135.

32. Plaintiff, the Union, and American each signed the agreement on their own behalf and each agreed, by signing the Last Chance Agreement, that the agreement was in lieu of termination for just cause.

33. After signing the Last Chance Agreement, plaintiff returned to work.

34. On January 27, 2017, without notifying the Union, plaintiff elected to revoke the Last Chance Agreement. In his letter revoking the Last Chance Agreement, plaintiff stated that he was revoking the agreement because:

   a. plaintiff was denied time to review the document;

   b. Gaskins refused to permit plaintiff to take an unsigned copy of the agreement;

   c. plaintiff felt coerced into signing the agreement;

   d. plaintiff felt that the company failed to comply with progressive discipline; and

   e. plaintiff disagreed that he had committed any misconduct on January 7, 2017.

35. On January 30, 2017, American terminated plaintiff's employment for "intentional work slow-downs" and "willful refusal or failure to follow a direction from management or refusal to perform assigned work." Brumfield Decl., Exh. O.

36. After American terminated plaintiff's employment, plaintiff was escorted from the building. *See* Mvuri Depo. I Tr. at 101-108.[7]

37. Turay did not understand that plaintiff desired Turay to file a grievance on plaintiff's behalf. Moreover, Turay did not believe a meritorious grievance challenging plaintiff's termination could have been pursued given: (i) Turay's conclusion that American had just cause to terminate plaintiff; and (ii) Turay's signature agreeing to the Last Chance Agreement. *See* Turay Decl. ¶ 10.

38. On July 23, 2017, plaintiff contacted American's human resources representative about the status of his "appeal."

---

[7] In his deposition, plaintiff first testified that he was escorted from National Airport immediately after he was terminated. *See* Mvuri Depo. I Tr. at 101-108. Later in his deposition, plaintiff contradicted his prior testimony and asserted that: before leaving the building, plaintiff signed a blank grievance form and left it with Turay. In this second version of his testimony, plaintiff testified that he understood that Turay was going to process a grievance challenging plaintiff's termination. *See* Mvuri Depo. I Tr. at 117. Turay did not have that understanding. *See* Turay Decl. ¶ 10. In any event, it is well-settled that, "a genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Vantage Marketing, Inc. v. De Amertek Corp., Inc.*, 31 F. App'x 109, 114 (4th Cir. 2002). Nevertheless, in the interest of completeness and recognizing that plaintiff is proceeding *pro se*, both versions of plaintiff's testimony are addressed further *infra*.

39. Around that same time, plaintiff called Turay about a grievance. Turay informed plaintiff that the time had passed for the filing of any grievance. *See* Turay Decl.[8]

40. On September 25, 2017, American responded that it had no record of any grievance filed by plaintiff and directed plaintiff to Turay or Union Representative Donald Fitzpatrick.

41. Sometime between September and November 2017, plaintiff spoke to Fitzpatrick, who provided plaintiff with contact information for the Union's Assistant General Chairman, Mark Baskett.

42. Baskett investigated the circumstances concerning plaintiff's termination and spoke to American on plaintiff's behalf. Baskett obtained a proposed settlement agreement from American, which would permit plaintiff to return to work on terms similar to the Last Chance Agreement.

43. On December 19, 2017, Baskett met with plaintiff in Charlotte, North Carolina. Baskett and plaintiff had never met before and plaintiff had no reason to believe that Baskett was hostile to plaintiff.

44. Baskett explained to plaintiff that based on Baskett's experience pursuing a grievance was not in plaintiff's best interest. Baskett presented plaintiff with American's new settlement offer and stated that he believed that plaintiff should sign it.

45. Plaintiff refused to sign American's settlement offer.

46. After this meeting, Baskett filed a grievance on behalf of plaintiff, which American denied as untimely.

47. On January 5, 2018, plaintiff filed a suit against American alleging that American had violated the CBA and engaged in harassment, national origin discrimination, and age discrimination. *See Mvuri v. American Airlines, Inc.*, No. 1:18-cv-797 (*Mvuri I*), Dkt. 1, Complaint.

48. On January 17, 2018, plaintiff filed this lawsuit.

---

[8] It is unclear whether plaintiff first reached out to American or to Turay. Turay's declaration states that plaintiff reached out to him "many months later." Turay Decl. ¶ 11. It appears that these contacts were close to the same timeframe. Although plaintiff suggests in his responses to the motions for summary judgment that he was in contact with Turay and other union representatives, plaintiff does not cite any record evidence for that allegation. Indeed, the only evidence that plaintiff cites with respect to his contacts with any Union representative is Turay's declaration that Turay did not hear from plaintiff for "many months." Accordingly, there is no genuine dispute as to any material fact and plaintiff's evidence supports the defendants' undisputed statement of fact that Turay did not hear from plaintiff for many months after plaintiff's termination.

49. On October 17, 2018, an Order issued which set forth the applicable deadlines for this case. The Order provided that *all* summary judgment motions were due to be filed by March 12, 2019. *See* Dkt. 29.

50. On January 11, 2019, summary judgment in favor of American was granted in *Mvuri I*. *See Mvuri I*, No. 18-cv-797, Dkt. 59, Order dated January 11, 2019 (order granting American's motion for summary judgment).

51. On March 8, 2019, an Order issued extending the deadline for filing dispositive motions to March 19, 2019. *See* Dkt. 38.

52. Defendants timely filed their motions for summary judgment on March 19, 2019. Defendants both gave the *pro se* plaintiff the notice required by *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). *See* Dkts. 39, 48.

53. On March 27, 2019, plaintiff filed his opposition to American's motion and a cross-motion for summary judgment against American.

54. On March 29, 2019, plaintiff filed his opposition to the Union's motion and a cross-motion for summary judgment against the Union.

55. A hearing was held on April 12, 2019. At the hearing, plaintiff rested on his briefs and did not wish to make any further argument.

## II.

The standard for summary judgment is too well-settled to require extensive discussion here. Simply put, summary judgment is appropriate when there is "no genuine issue as to any material fact" and based on those undisputed facts the moving party "is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To serve as a bar to summary judgment, facts must be "material," which means that the disputed fact "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Importantly, at the summary judgment stage, courts must "view the evidence in the light most favorable to . . . the non-movant." *Dennis v. Columbia Collection Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, allows plaintiffs

to "[b]ring suits for violations of contracts between an employer and a labor organization" in

federal court. Ordinarily, an employee who wants to sue his employer for violating a collective

bargaining agreement must first exhaust the contractual remedies available pursuant to that

agreement. *See Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652-53 (1965). In a so-called

"hybrid § 301" case,[9] like the claims presented here, an employee may forego exhaustion by

showing "*both* 1) that the union breached its duty of fair representation and 2) that his employer

violated the collective bargaining agreement." *Thompson v. Aluminum Co. of Am.*, 276 F.3d

651, 656 (4th Cir. 2002) (emphasis in original). A union breaches its duty of fair representation

"if its actions are either 'arbitrary, discriminatory, or in bad faith.'" *Air Line Pilots Ass'n, Int'l v.*

*O'Neill*, 499 U.S. 65, 67 (1991). In a hybrid § 301 case, both the claim for breach of the duty of

fair representation and the claim for breach of the CBA are subject to a six-month statute of

limitations. *See DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 169-70 (1983).

Here, plaintiff's complaint consists of three counts: (i) Count I asserts a breach of duty of

fair representation claim against the Union concerning plaintiff's discharge; (ii) Count II asserts a

breach of the CBA by American concerning failure to provide notice of the Level 3 discipline; and

---

[9] A hybrid § 301 case typically refers to cases in which an employee asserts an unexhausted claim for breach of a CBA against his employer and a claim for breach of the duty of fair representation against his Union. As the Supreme Court has noted

> "[s]uch hybrid suits formally comprise two causes of action. First the employee alleges that the employer violated § 301 of the Labor Management Relations Act, 1947 (LMRA), 61 Stat. 156, 29 U.S.C. § 185, by breaching the collective bargaining agreement. Second, the employee claims that the union breached its duty of fair representation which this Court has implied from the scheme of the NLRA, by mishandling the ensuing grievance-and-arbitration proceedings."

*Reed v. United Transp. Union*, 488 U.S. 319, 328 (1989).

(iii) Count III asserts a breach of the CBA by American concerning plaintiff's discharge. Plaintiff's hybrid § 301 claims for breach of the duty of fair representation and breach of the CBA are untimely because the complaint was filed well after plaintiff had reason to know that the Union had not filed a grievance against American on his behalf and more than six months after plaintiff's discharge. Moreover, plaintiff cannot show that the Union breached its duty of fair representation, because plaintiff points to no evidence that the Union acted arbitrarily, discriminatorily, or in bad faith. To the contrary, the Union appears to have advocated for plaintiff even after he was terminated. American did not violate any provision of the CBA. Accordingly, plaintiff's motions for summary judgment must be denied and defendants' motions for summary judgment must be granted.

## A.

For hybrid § 301 claims, the applicable six-month statute of limitations begins to run when "the plaintiff knows or should have known that a violation of his rights has occurred," or when a plaintiff "discovers, or in the exercise of reasonable due diligence should have discovered, the acts constituting the alleged violation." *Gilfillan v. Celanese Ag*, 24 F. App'x 165, 167 (4th Cir. 2001). As one district court has recognized,

> "courts have uniformly held that the limitations period on such a claim does not commence merely upon an employer's violation of a collective bargaining agreement, but only when the employee also obtains actual or imputed knowledge of the conduct alleged to constitute a breach of the union's duty of fair representation."

*Mincey v. U.S. Postal Serv.*, 879 F. Supp. 567, 572 (D.S.C. 1995) (citing *Flanigan v. Truck Drivers Local 671*, 942 F.2d 824, 827 (2d Cir. 1991)). Courts have also recognized that "a hybrid § 301 action accrues against the company when it accrues against the union." *Moore v. United Auto.,*

*Aerospace, Agric. Implement Workers of Am. Int'l Union Local 598*, 33 F. App'x 165 (6th Cir. 2002).[10]

1.

Plaintiff's claims in Counts I (duty of fair representation) and III (breach of CBA) of the complaint are premised on his January 30, 2017 discharge. As the undisputed material facts reflect, the complaint raising these claims was filed more than six months after plaintiff knew, or in the exercise of due diligence should have known, that his claims against American and the Union had accrued. In short, plaintiff filed his complaint in this case more than six months after he had reason to know that the Union had not filed a grievance against American concerning his discharge.

To begin with, although a hybrid § 301 case involves separate breaches by the employer and the union, the claims accrue only when the plaintiff knows or should have known of the Union's alleged breach of the duty of fair representation. *See White*, 128 F.3d at 114; *see also Ryder v. Phillip Morris, Inc.*, 946 F. Supp. 422, 429 (E.D. Va. 1996) ("Only when Ryder knew of this breach [of the duty of fair representation], or in the exercise of reasonable diligence should have known of it, would his claim have accrued."). Thus, a claim against the employer for the breach of the CBA accrues at the same time as the claim for the Union's breach of the duty of fair representation, because it is the Union's breach that excuses the plaintiff's failure to exhaust the grievance process.[11] Accordingly, the statute of limitations analysis appropriately focuses on

---

[10] *See also White v. White Rose Food, a Div. of DiGiorgio Corp.*, 128 F.3d 110, 114 (2d Cir. 1997) ("The limitations period on [a] 'hybrid § 301/DFR' [claim] is six months, which begins to run when the employee knew or should have known of the breach of the duty of fair representation."); *Barlow v. Am. Nat'l Can Co.*, 173 F.3d 640, 642 (8th Cir. 1999) ("Because the union's breach of duty is a necessary element of a § 301 claim against the employer, the employee's claims against both typically accrue, for statute of limitations purposes, when the union's breach of duty injures the employee.").

[11] *See Vaca v. Sipes*, 386 U.S. 171, 186 (1967) ("[A] wrongfully discharged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual

whether plaintiff filed his complaint within six months of when he knew, or in the exercise of reasonable diligence should have known, that the Union had not filed and would not pursue a grievance concerning plaintiff's discharge.

The undisputed record clearly establishes that paintiff failed to file his complaint within six months of when he knew that the Union had not filed a grievance concerning plaintiff's discharge. In this regard, the undisputed material facts on this summary judgment record show that plaintiff never invoked the grievance process by submitting a grievance to the Union upon his termination. Accordingly, plaintiff had reason to know that no grievance was filed on January 30, 2017 and that the statute of limitations on his claims expired on July 31, 2017. Plaintiff improperly attempts to create a dispute of fact by contradicting his own testimony on this point, which he cannot do. *See Vantage Marketing*, 31 F. App'x at 114. Because the statute of limitations ran on July 31, 2017, plaintiff's complaint – filed on January 17, 2018 – is untimely and summary judgment must be entered in favor of defendants.

Even if plaintiff's version – which is unsupported by the record – is considered, the result does not change; plaintiff's complaint is still untimely. In this version, plaintiff asserts that he submitted an incomplete, but signed, grievance form to Turay on January 30, 2017. Pursuant to the CBA, the Union had 7 days – by February 6, 2017 – in which to file plaintiff's grievance. That did not occur. And the last date to hold a hearing on any grievance that had been filed would have been February 16, 2017. Thus, by February 16, 2017, plaintiff should have known that Turay did not file the blank grievance form that plaintiff claims he gave to Turay. Plaintiff clearly should have known by February 16, 2017 that the Union was not proceeding with his grievance because plaintiff was not informed of a hearing date. At the very latest, therefore, when plaintiff had heard

---

remedies, provided the employee can prove that the union as the bargaining agent breached its duty of fair representation in the handling of the employee's grievance.").

nothing by April 27, 2017 – the date by which all of the steps of the grievance process would have been completed pursuant to the CBA deadlines – plaintiff should have known that his grievance was not filed and was not being processed. Accordingly, plaintiff, in the exercise of due diligence, having heard nothing from the Union regarding any of these steps, should have inquired of the Union and American regarding the status of his alleged grievance and filed his complaint within six months of April 27, 2017 – namely by October 27, 2017. He did not do so; plaintiff did not file his complaint until January 17, 2018.

Plaintiff claims that he was not informed of the Union's inactivity until September 25, 2017. The law precludes this claim; plaintiff is not permitted to sit back and do nothing as time passes without hearing anything regarding his purported grievance – a grievance that he never filed. On similar facts, the Seventh Circuit, in *Metz v. Tootsie Roll Industries, Inc.*, 715 F.2d 299 (7th Cir. 1983), found that a plaintiff's hybrid § 301 claim was untimely. In *Metz*, the plaintiff alleged that she repeatedly requested that the union process her grievance, but the union took no action. *See id.* at 304. In concluding that the plaintiff's claim was untimely, the Seventh Circuit noted that the CBA required that the grievance procedures be exhausted within 23 days and that the union inactivity "should have been discovered by a reasonably diligent claimant prior to the statutory period." *Id.*[12] The same result should occur here; plaintiff – who has a background in labor relations – should have acted promptly when he did not hear from the Union as the various deadlines for the grievance process expire. Instead, plaintiff did nothing; and, in so doing, plaintiff allowed the statute of limitations on his claims to expire.

---

[12] *See also Hollingsworth v. Ford Motor Co.*, 644 F. App'x 496, 504 (6th Cir. 2016) ("Hollingsworth had access to the CBA and is deemed to know its contents. . . [W]aiting until January 2013 to send a letter asking the UAW to file a grievance about an incident that occurred in April 2011 is not acting with 'due diligence.").

To avoid this result, plaintiff asserts, without citation to any portion of the record, that he made repeated inquiries to the Union on the status of his grievance. The undisputed facts of this case, however, are that plaintiff did not contact Turay, his union steward, until many months after his discharge. *See* Turay Decl. ¶ 11. By then, plaintiff should have known that his to time to file a complaint based on these claims was expiring, because plaintiff knew or should have known that the Union had not filed his grievance when February 16, 2017 passed without any notice of hearing. That plaintiff contacted Turay many months after plaintiff's discharge, and many months after plaintiff knew or should have known that no grievance was filed, does not extend the statute of limitations or toll the limitations period. *See Marshburn v. Richardson*, No. 89-cv-489, 1989 WL 237753, at \*2 (E.D. Va. Nov. 14, 1989) (holding that continued contact with the union does not give rise to a continuing violation that extends the statute of limitations). Plaintiff does not claim that the Union ever advised him that his purported grievance had been filed. Indeed, the actions that plaintiff did take – emailing American on July 23, 2017 – demonstrate that plaintiff knew that he should have heard from the Union or American regarding his purported grievance well before the date that he sent that email.[13]

In sum, plaintiff, in the exercise of reasonable diligence, should have known that the Union was not pursuing a grievance on his behalf when no hearing was held by February 16, 2017, the date by which the CBA required a hearing. Plaintiff could have had no doubt that a grievance had

---

[13] *See also Carlton v. Local No. 7 UFCW Int'l Union*, 43 F. App'x 289, 295 (10th Cir. 2002) ("Whether or not Plaintiffs received actual notice of the dismissal of their charges is irrelevant in this case; the Plaintiffs have failed to argue, much less demonstrate, why they could not have learned about the dismissal through the exercise of reasonable diligence."); *Cohen v. Flushing Hosp. & Med. Ctr.*, 68 F.3d 64, 69 (2d Cir. 1995) ("Under the CBA, the Union had up to 10 days to file a grievance on [plaintiff's] behalf. When it did not, [plaintiff] should have known at some point in the ensuing six months that the Union was not representing him."); *Goins v. Bakery, Confectionary & Tobacco Workers Local Union 203-T*, 953 F. Supp. 130, 133 (E.D. Va. 1996) ("The meager inquiries represented by the four letters are not evidence of Plaintiff's ignorance of Defendant's position and do not serve to toll the statute in this case.").

not been filed when April 26, 2017 came and passed, and he had heard nothing about any of the steps required to be taken under the CBA. In short, by April 26, 2017, plaintiff should have known that no grievance had been filed and that the Union was not pursuing his grievance at that time. Therefore, plaintiff should have filed his complaint by October 27, 2017 – within six months. Instead, the record in this case shows that plaintiff waited months after his discharge to contact Turay or American and waited until January 11, 2018 to file his complaint in this case, well after the passage of the six month statute of limitations. Accordingly, plaintiff's claims for breach of the duty of fair representation and breach of the CBA concerning his discharge are untimely and summary judgment on Counts I and III must be entered in favor of defendants.

2.

Count II of the complaint asserts that American violated the CBA by failing to notify plaintiff of the Level 3 discipline plaintiff received on October 28, 2016. Plaintiff asserts that he first learned of this discipline at the January 22, 2017 disciplinary hearing and that, pursuant to the Article 20(C) of the CBA, he was entitled to notice of the Level 3 discipline within fourteen days of its issuance. Plaintiff's claim in this respect is also untimely.

As stated, plaintiff had six months from the time the alleged violation of the CBA occurred to file this lawsuit. *See DelCostello*, 462 U.S. at 169-70. Here, the undisputed facts show that plaintiff learned of the October 2016 discipline when American issued the Level 3 discipline on October 28, 2016. And the record reflects that plaintiff filed no grievance related to that discipline. Accordingly, plaintiff was required to file any complaint based on the October 2016 discipline by April 30, 2017. Instead, plaintiff waited until January 17, 2018 to file his complaint and, in this respect, his claim in Count II is untimely.

18

Seeking to avoid this result, plaintiff relies on his unsupported argument that he did not learn of the October 28, 2016 Level 3 discipline until January 22, 2017. Plaintiff, however, does not allege that he asked the Union to file a grievance related to his lack of notice of that discipline. Accordingly, even under plaintiff's version of the facts, his claim in Count II remains untimely, because plaintiff was required to file any claim related to the Level 3 discipline by July 24, 2017 – six months after he admits that he learned of the October 28, 2016 Level 3 discipline. To satisfy the six-month statute of limitations, plaintiff's complaint should have been filed well before January 2018 and summary judgment on Count II must be entered in favor of American.

## B.

As noted, plaintiff's claims against the Union for breach of the duty of fair representation and against American for breach of the CBA are not only time barred, they also fail on the merits. Because a plaintiff must establish both a breach of the duty of fair representation and a breach of the CBA,[14] an analysis of the merits properly begins with a determination whether the Union's conduct is "arbitrary, discriminatory, or in bad faith." *Air Line Pilots Ass'n, Int'l*, 499 U.S. at 67. And, a union's actions are "arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Id.* (internal citations omitted). Similarly, the duty of fair representation prohibits "only 'invidious' discrimination, such as discrimination based on constitutionally protected categories like race or gender." *Jeffreys v. Commc'ns Workers of Am., AFL-CIO*, 354 F.3d 270, 276 (4th Cir. 2003). Bad faith involves "fraud, or deceitful or dishonest action." *Id.* (internal

---

[14] As the Supreme Court has recognized, a plaintiff "may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both." *DelCostello*, 462 U.S. at 165. Here, plaintiff has sued both defendants concerning his discharge, but only American for the lack of notice of his Level 3 discipline.

citations omitted). As the undisputed factual record reflects, plaintiff's claims fall far short of meeting this standard.

**1.**

In Count I, plaintiff asserts that the Union breached its duty of fair representation by failing to pursue a grievance challenging plaintiff's discharge. Plaintiff does not assert that the Union discriminated against him;[15] rather, plaintiff argues that the Union was arbitrary and acted in bad faith. Plaintiff claims that the following acts are evidence of the Union's breach of its duty: (i) the Union's reliance on the Last Chance Agreement; (ii) Turay's denial that plaintiff gave him a signed grievance form to file; (iii) the Union's failure to communicate with plaintiff regarding its abandonment of his grievance; (iv) Baskett's interactions with plaintiff and conduct following plaintiff's termination; and (v) the Union's failure to challenge the October 2016 Level 3 discipline. None of these examples demonstrates that the Union acted arbitrarily or in bad faith. To the contrary, the summary judgment record demonstrates that the Union worked diligently on plaintiff's behalf and successfully convinced American to retain plaintiff in his job, only to have plaintiff reject two offers to retain his job.[16]

Each of plaintiff's arguments is easily dismissed. To begin with, the Last Chance Agreement – which plaintiff signed – was an admission by the Union and by plaintiff that American was justified in terminating plaintiff's employment. Plaintiff's revocation of the agreement does not erase these admissions by plaintiff and the Union.[17] It is not irrational or

---

[15] Although plaintiff asserts that the Union was "hostile" towards him, he bases this allegation on his claims that the Union was deceitful – not on any allegation that the Union discriminated against him based on his race or any protected category.

[16] Namely, the Last Chance Agreement and the offer that Baskett obtained for plaintiff in December 2017.

[17] Nor is there any doubt that American may rely on plaintiff's admissions and statements in the Last Chance Agreement as those statements are admissions by a party opponent. *See* Rule 801(d)(2), Fed. R. Evid. And, a statement written by someone else but signed by a party opponent constitutes an admission

unreasonable for the Union to determine that the Union should not pursue a grievance where the Union and plaintiff have signed an agreement acknowledging American's just cause to terminate the plaintiff.[18]

Next, plaintiff argues that Turay's statement that he did not receive a grievance form from plaintiff demonstrates the Union's deceitfulness and bad faith. Yet the undisputed facts establish that plaintiff did not file a grievance or give Turay a grievance form. Plaintiff's unsupported allegations that he left a blank grievance form with Turay establishes, at most, that there was a miscommunication between plaintiff and Turay. Turay did not understand that plaintiff wished to file a grievance concerning plaintiff's discharge. *See* Turay Decl. ¶ 10. Indeed, the exchange between Turay and plaintiff many months after plaintiff's discharge demonstrates the extent of the miscommunication between them: plaintiff was inquiring about a grievance he thought the Union had filed and Turay was informing plaintiff that it was too late to file a grievance concerning his

---

of the party under the Rule. *See United States v. Johnson*, 529 F.2d 581, 584 (8th Cir.) *cert. denied*, 426 U.S. 909 (1976); *McQueeny v. Wilmington Trust Co.*, 779 F.2d 916, 930 (3d Cir. 1985) (signature on document prepared by others includes adoption of contents therein and a non-hearsay admission by a party opponent). Plaintiff revoked the Last Chance Agreement because he did not like the terms, not because the statements contained within it are untrue. Importantly, the fact that the Last Chance Agreement no longer has legal effect, because plaintiff later revoked the agreement, does not alter the fact that the statements were made in the Last Change Agreement and would be admissible. *C.f. Medrano Diaz v. Vazquez-Botet*, 204 B.R. 842, 848 (D.P.R. 1996) ("To summarize, regardless of whether these documents still have legal effect as notarized public instruments, Plaintiff's admissions under oath contained therein are admissible as evidence . . . .").

[18] *See, e.g., Williams v. Simmons Co.*, 185 F. Supp. 2d 665, 677 (N.D. Texas 2001) ("The Union would be free in its discretion to decline to pursue such a claim if it considered Plaintiffs' claim, and instead attempt[ed] to preserve Plaintiffs' jobs by giving them a last chance."); *George v. NW Airlines, Inc.*, 351 F. Supp. 2d 310, 316 (E.D. Pa. 2005) ("The Union did not believe the Plaintiffs would be successful at arbitration. Therefore, when Plaintiffs refused to sign the second [Last Chance Agreement], the Union withdrew their complaint to the Board. Nothing about this decision appears to be hostile, discriminatory, arbitrary, unreasonable, or in bad faith."); *Thomas v. Ford Motor Co.*, 2000 WL 951733, at *20 (N.D. Ga. Feb. 10, 2000) ("She has not shown, however, any evidence that UAW acted improperly in attempting to secure the most favorable terms of reinstatement on her behalf.").

discharge.[19] A miscommunication constitutes "simple negligence, ineffectiveness or poor judgment" which is "not sufficient to establish a breach of the duty." *Basnight v. HRSA-ILA Mgmt.*, No. 4-cv-782, 2006 WL 2850650, at *9 (E.D. Va. Sept. 28, 2006).[20] To the contrary, at his deposition, plaintiff agreed that Turay was friendly and that Turay was sincere in his various recommendations to plaintiff. It is difficult therefore to see that the Union was deceitful. In addition to this miscommunication, plaintiff complains about a lack of communication from the Union. But the Union had no reason to contact plaintiff following his termination, as plaintiff did not file a grievance and all parties had signed the Last Chance Agreement before he was discharged. *See Groves*, 815 F.3d at 182 (union failure to contact plaintiffs "did not contribute to the employee's failure to exhaust their contractual remedies").[21] Had plaintiff intended for the Union to file a grievance, he bore responsibility for following up with the Union after his termination. Yet plaintiff did not inquire regarding his alleged grievance for many months. *See* Turay Decl. ¶ 11. Thus, these communication problems between plaintiff and the Union, to the extent they were errors on the Union's part do not demonstrate bad faith or establish a breach of the duty of fair representation.

---

[19] Plaintiff describes Turay's affidavit as "obviously false" because Turay recites that, many months after plaintiff's termination, plaintiff called to "ask about a grievance" and Turay informed plaintiff "the time had passed for the filing of a grievance." To begin with, as described *supra*, plaintiff does not point to any evidence in the record that contradicts Turay's affidavit. Plaintiff argues that he could not call to ask about a grievance if a grievance was never filed. Pl. American Opp'n at 27. Plaintiff's argument, however, necessitates the inference that when Turay attests that plaintiff asked about a grievance Turay means a grievance filed in January 2017. This inference is unsupported, as Turay never suggests that plaintiff filed a grievance. Turay's statement simply states that plaintiff inquired about a grievance and that Turay responded that plaintiff was too late to file a grievance.

[20] *See Humphress v. UPS, Inc.*, 31 F. Supp. 1004, 1013 (W.D. Ky. 1997) (holding that the union cannot "be held responsible for [plaintiff's] erroneous perception").

[21] *See also Tracy v. Local 2555 Int'l Union of Elec., Tech., Salaried & Mach. Workers, AFL-CIO*, 783 F. Supp. 1527, 1531 (D. Mass. 1992) ("Lack of communication, without more is insufficient to evidence arbitrary or capricious processing of a claim.")

Similarly, plaintiff's arguments concerning the October 28, 2016 Level 3 discipline fail to establish that the Union breached its duty of fair representation in this regard. This argument fails because plaintiff never *asked* the Union to challenge the Level 3 discipline. Moreover, as discussed *infra* in Section III.C.1, plaintiff points to no provision of the CBA establishing that plaintiff could not be terminated before receiving a Level 3 discipline. Again, the Union did not breach its duty of fair representation where plaintiff failed to communicate his desire to file a grievance and misunderstood the CBA to preclude discharge before receipt of Level 3 discipline.

In a surprising twist of logic, plaintiff also asserts that Baskett's filing of a grievance in December 2017 demonstrates the Union's deceitful contact. To the contrary, the uncontroverted evidence in the summary judgment record is that in December 2017 Baskett filed a grievance challenging plaintiff's termination as "an additional effort to obtain relief for Mr. Mvuri." Baskett Decl. ¶ 8. Baskett does not suggest that the grievance was filed because the Union realized it was meritorious, rather the grievance was filed to accommodate plaintiff's desire to file a grievance. Significantly, contrary to plaintiff's claim of a breach of the duty of fair representation, the Union's efforts contributed to plaintiff receiving offers from American for the very relief that plaintiff seeks in this litigation – reinstatement to his position. Far from showing that the Union acted arbitrarily or in a manner hostile to plaintiff, the summary judgment record reflects that the Union successfully obtained reinstatement for plaintiff, which plaintiff rejected. The fact that Baskett did not file a grievance until December 2017 does not demonstrate any inconsistency or arbitrariness by the Union, but rather the Union's desire to accommodate plaintiff.

In sum, plaintiff has produced no evidence – either in support of his own motion for summary judgment or in opposition to defendants' motions for summary judgment – that the Union's conduct was "grossly deficient or in reckless disregard" of his rights. *Hodges v. Phillip*

*Morris USA, Inc.*, 88 F. App'x 584 (4th Cir. 2004). Here, the Union – and plaintiff – had already conceded in the Last Chance Agreement that American was justified in terminating plaintiff's employment. It is hardly surprising that the Union would not then turn around and claim that such termination was unjust. The Union's conduct was well within the "wide range of reasonableness" permitted for such decisions. *Air Line Pilots Ass'n*, 499 U.S. at 76. Thus, the Union did not breach its duty of fair representation and defendants' motions for summary judgment must be granted.

**2.**

In Count II, plaintiff bases his hybrid § 301 claim against American on the failure to provide plaintiff with notice of the October 2016 Level 3 discipline. Although Count II is asserted only against American, plaintiff cannot recover unless he establishes that the Union breached its duty of fair representation in this regard. *See Thompson*, 276 F.3d at 656 (an employee may forego exhaustion only by showing both a breach by the employer and the union). Nowhere in the complaint or in his briefs does plaintiff assert that he asked the Union to file a grievance related to the Level 3 discipline. Moreover, there is no allegation that any act by the Union "played some role in the employee's failure to exhaust his contractual remedies" as required to state a hybrid § 301 claim. *Groves*, 815 F.3d at 182. In *Groves*, the Fourth Circuit held that there "must be some causal nexus between a union's breach of its duty of fair representation and an employee's failure to exhaust contractual remedies." *Id*. There, as in this case, the plaintiffs failed to file a grievance with the Union. *Id*. On these facts, the Fourth Circuit concluded that the plaintiffs had failed to establish a breach of the duty of fair representation. *See id*. Similarly, plaintiff here has not alleged nor submitted legally admissible evidence that he ever requested that the Union file a grievance based on the lack of notice of the Level 3 discipline. Therefore, he cannot justify his failure to

exhaust his contractual remedies based on a breach of the duty of fair representation by the Union. Accordingly, the Union did not breach its duty of fair representation with respect to the Level 3 discipline, and summary judgment must be entered in favor of American.

## C.

### 1.

Count III alleges that American violated the CBA with respect to plaintiff's discharge by:[22] (i) failing to follow progressive discipline policies; and (ii) terminating plaintiff without just cause. This claim fails on the merits because plaintiff can point to no provision of the CBA establishing that he was entitled to progressive discipline. Moreover, plaintiff admits that, with respect to his January 2017 discipline, he did what American has accused him of doing – namely being in the bag room when he was assigned to the ramp. Thus, plaintiff's motions for summary judgment must be denied, and defendants' motions for summary judgment must be granted.

Plaintiff claims that American violated the CBA by failing to issue a Level 3 discipline before his termination in January 2017. As discussed *supra*, the undisputed material facts show that plaintiff was issued a Level 3 discipline on October 28, 2016. Even if plaintiff's unsupported allegations were sufficient to create a genuine dispute of fact, however, plaintiff's argument fails because he cannot show that any provision of the CBA was violated by American's purported failure to issue a Level 3 discipline. Plaintiff points to two provisions of

---

[22] In his cross-motion for summary judgment, plaintiff asserts, for the first time, that his hybrid § 301 claim is also based on his submission of requests to transfer from National Airport to Charlotte, North Carolina in 2015. The Fourth Circuit has sensibly held that a plaintiff may not proceed on claims that are not raised in his complaint. *See Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) ("We have previously held, along with the Fifth, Sixth, Seventh, and Eleventh Circuits, that a plaintiff may not raise new claims after discovery has begun without amending his complaint."); *Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 946 (4th Cir. 2013). Moreover, any claims regarding plaintiff's requests for transfer in 2015 are time-barred. *See DelCostello*, 462 U.S. at 155. Accordingly, to the extent plaintiff's motions for summary judgment are based on his 2015 transfer requests, they must be denied.

the CBA which mention progressive discipline. In Article 28(A), the CBA provides that: "Level I, II, and III disciplinary letters . . . shall not remain in [employees'] personnel record for a period of more than twelve (12) active motions except when associated with a higher discipline level." Likewise, Article 8(H) provides that "[e]mployees on level three (3) of the progressive discipline or attendance control programs are not eligible for any system transfers." Neither provision, however, *compels or requires* the use of progressive discipline. Nor do other provisions of the CBA require that American engage in progressive discipline. By contrast, American's Rules of Conduct specifically provide that "[s]ome violations of our Guiding Principles and Rules of Conduct will result in immediate termination." Rules of Conduct at 2.

Both the Union and American produced evidence that progressive discipline is not required. Turay, a union steward, averred that "progressive discipline is not specifically required by the CBA" and that American "has terminated employees without first using all the progressive disciplinary steps." Turay Decl. ¶ 3. Likewise, Gaskins, a manager, averred that "the Company reserves the right to progress an employee to any [discipline] level or terminate an employee without first using the progressive disciplinary system." Gaskins Decl. ¶ 5. Plaintiff conclusorily asserts that American has always used progressive discipline; however, plaintiff provides no citation to any portion of the record or the CBA that supports his allegation. Accordingly, the undisputed facts demonstrate that progressive discipline was not required under the CBA.

Plaintiff also asserts that American violated the CBA by discharging him without just cause. The letter formally discharging plaintiff stated that plaintiff was terminated for engaging in "intentional work slow-downs or reductions in productivity or workmanship or willful refusal or failure to follow a direction from management or refusal to perform assigned work." Plaintiff

26

argues that he never violated any of those provisions. At his deposition, however, plaintiff admitted, with respect to the January 7, 2017 incident: "I did what they [American] said, but I was not wrong or culpable." Mvuri Depo. I Tr. at 94:5-9. Moreover, in the Last Chance Agreement, plaintiff conceded that American had just cause to terminate his employment. Although that agreement was later revoked, plaintiff's admission that his behavior warranted discharge does not disappear. Moreover, plaintiff's disciplinary history belies plaintiff's denial of reductions in productivity or refusals to perform assigned work. Even discounting the October 2016 discipline, plaintiff was disciplined four times in the two years prior to the January 7, 2017 incident for similar behavior. Accordingly, plaintiff's discharge did not violate the CBA, and summary judgment must be granted in favor of defendants.

## 2.

Count II of the complaint asserts that American violated Article 20(C) of the CBA by failing to notify plaintiff of the Level 3 discipline that plaintiff received on October 28, 2016. Yet, the undisputed record facts establish that plaintiff received notice of the Level 3 discipline when the discipline issued in October 2016. Plaintiff's unsupported statement does not effectively dispute defendant's legally admissible evidence and create a dispute of material fact. Even if plaintiff did not receive notice of this discipline, plaintiff is not entitled to summary judgment on this Count because, as discussed *supra*, his claim is untimely, and plaintiff cannot show that the Union violated any duty of fair representation in connection with the Level 3 discipline. *See Thompson*, 276 F.3d at 656. Accordingly, summary judgment in favor of American must be entered on Count II.

## IV.

For the reasons set forth above, defendants' motions for summary judgment will be granted and plaintiff's cross-motions for summary judgment will be denied.

An appropriate order will issue separately.

The Clerk is directed to provide a copy of this Opinion to the *pro se* plaintiff and all counsel of record.

September 11, 2019
Alexandria, VA

/s/

T. S. Ellis, III
United States District Judge